Good afternoon, Your Honors. May it please the Court. Christy Webb for the appellant, Andrew Guyton. This is a case about a seven-year employee of Defendant Pharmaceutical Company who was a good, successful sales representative, and the defendant even admits that. Mr. Guyton looked around and saw that there were other employees in similar positions, other sales representatives, who were not members of a protected class, either African American or over 40, and were being treated differently for serious policy violations, as serious or more serious than why he was placed on an action plan for having delayed reporting for what might be called tardy call logging and expense reporting. He was accurate and truthful, but not timely. That management action plan derailed his efforts to transfer to a better situation from then to the end of his employment over a year later. The judgment should be reversed because there are tribal issues and material fact on both discrimination and retaliation, and I'm going to talk a little bit this afternoon about the substantial evidence of pretext and some of the elements that were questioned by the court. So as to pretext, we have a plaintiff employee who can prove pretext in two ways, and the way that that applies here is indirectly, by showing that the employer's proffered explanation is unworthy of credence because it is internally inconsistent or otherwise not believable, or directly by showing that unlike lawful discrimination, more likely motivated the employer. So if we look at the internally inconsistent, what we see that goes to pretext are a lot of other employees, a lot of other outrageous policy violations that were not disciplined, were not subject to discipline in the same way that Mr. Guyton was. So how he was treated compared to his sales colleagues, other sales representatives, who committed violations of policy that could be seen by the jury as equally or more serious is relevant both to the prima facie case element of qualified for transfer and to pretext for the discipline that prevented him from transferring out of that district. It is against policy to falsify visits to health care providers' offices and to give away samples to doctors, yet a female, and not report those accurately, and yet a female employee under age 40 did it and regional manager, Mayo Tun, promoted her more than once. She did it more than once or she was promoted more than once? She was promoted more than once. Is there anything in the record that she did that more than one time where she's told not to, I think? There isn't anything in the record. Okay. And forgive me, but her name is? Her name is Wilson. Okay. Wilson. She did this. I think she volunteered or certainly admitted that she did it and she was told not to. She did. Okay. And then she was promoted more than once. Yes, she was. And Mr. Guyton heard this employee, Wilson, admit that she falsified call records and Tun only told her not to do it again. It's against their anti-kickback policy, a very important public interest policy, anti-kickback policy to bribe a health facility into using the defendant's product. Now, forgive me again, but I thought the infraction here was giving away samples. Is it failing to log her calls? In relation to Wilson. Now we've moved on to somebody else. I've moved on to Okuhara and Supervisor Sutton. Thank you. Because that incident, what I'm going to talk about now, was not actually, it wasn't, I don't believe, mentioned in the decision. I'm trying to figure out somebody else who's similarly situated. Is there somebody else who didn't log calls? I don't have anybody who didn't log calls. Wilson would be the closest. But our position is that if it's a more egregious policy violation, like an anti-kickback policy, for those employees not to be disciplined the way Mr. Guyton was. Okay, and Wilson you think was more egregious? Yes. And what Wilson did was give away samples. Yes? She gave away samples, but she also recorded, hers could be akin to a logging problem. She actually lied on her logs. She wrote them all up. The day she gave away some of them, she wrote it all up as though she'd given away all of them. Right. And this is the one that's most closely related? That's an inaccurate logging problem, yes. I mean, that's more than inaccurate. That's misleading. That's a false falsification. I just want to know, is this the one that is most closely similar situated? Yes, it is. Thank you. Yes, it is, Your Honor. Because it's a logging issue. But there are some that are more egregious. How does this relate to the promotion claim? It doesn't. It relates to the promotion claim only because it's where we get into pretext. And it doesn't relate to the promotion claim directly. It's more related to the transfer claims. I understand the relation to the transfer. Because it's about pretext for how he was disciplined and how that interfered with his transfer prospects. So it's against public policy and anti-kickback laws to bribe a health facility into using only their product. But Supervisor Sutton encouraged the practice for another sales rep named who had a quid pro quo to give away insulin samples to a health care facility. And the people there, the nursing staff, said the facility in exchange would agree to use only the defendant's product. Okahara, not only was he not disciplined, but he was encouraged by Supervisor Sutton, the management person, who was Mr. Guyton's direct supervisor. That sounds less a question of discrimination and more of employers affirmatively engaging in misconduct. It may be a bad thing, but it sounds to me like they were encouraging kickbacks. Correct. And that's a big no-no in terms of a policy violation, their own policy. It may well be, but then it doesn't become a matter of discrimination. It's not that they prefer the person, it's that they prefer the rule. There's one rule that they encourage employees to violate. That's certainly not unheard of. Yes, Your Honor, but here Mr. Guyton had already been written up for what could be seen as less egregious policy violation. He doesn't report his sales calls on time. You could see it that way, but you could also, I mean, the employer says, well, this is just a rule, the other rule. The anti-kickback policy is, you know, we sort of encourage employees to violate it because it's good for business. That's why it sounds to me like what's going on. It's not like you're overlooking a violation that they consider to be egregious, but they're forgiving it to one guy but not the other guy. Yes, but then why is Mr. Guyton, who's African-American, he's the only one who gets written up for this, you know, failure to log on time. Well, if he had done kickbacks and gotten disciplined for that, then you'd have an equivalence. But it sounds to me like they were not enforcing the rules equivalently, not because of the person but because they just didn't like one of the rules. They had the rule in the books, but they just chose not to follow it. Right. Well, that's correct, John, but what comes into play here in the interim, before he gets his disciplinary write-up, the action plan for failure to log on time, and while all of this is going on and not being disciplined, he makes a complaint about the promotion and says that was unfair, you're treating me unfairly, you're treating me differently than other employees. And right after that, he gets this disciplinary write-up, the action plan in November 2012. He also got a new supervisor who came in. Yes, he did. And the opposing counsel argues the new supervisor came in when Sutton went on maternity leave and that she was essentially a tougher grader and that he had a history of logging calls chronically late. So, I mean, you know that, of course. I do. Would you like to respond? Yes. He did have that history, but remember, that history starts before August 2012. It starts earlier. That's their point. It starts way before. That's their point. Yes, that's correct. But all along, he hadn't been made to believe that that was going to be a disciplinary-worthy conduct. And in August 2012, remember, he gets that performance evaluation that doesn't even mention it. Please correct me. Between January of 2009 and January of 2012, Supervisor McGregor verbally counsels him about this noncompliance with the logging on numerous occasions, I think, according to the testimony, right? Yes. Verbally counsels him. Doesn't say you're going to be written up for it. Doesn't say it's worthy of discipline or termination or something. Okay. And then between October and November of 2012, there's more than 100 calls logged late. And your position is no one talked to him about that? He's never counseled about this until he's put on the performance improvement plan or then the action plan? He's counseled about it, Your Honor. Okay. It's not necessarily that they say to him, you know, this is going to be something we're going to discipline you for. Are they required to tell him they're going to discipline him? If they're talking, I mean, I'm not sure where you draw the line or if you're making a distinction that I'm missing in the case law. Can you help me out with this? Well, there isn't a distinction in the case law, and there actually isn't. There's possibly a distinction in their internal policies about progressive discipline, but he wasn't given any warning that we're now going to do this to you. And it's suspect that it happened only after he complained about disparate treatment with respect to the promotion. Okay. That's our argument. It happened two weeks later. He gets his first action plan. And, yes, it was from a different supervisor who was filling in while Supervisor Sutton was on maternity leave, but Guyton has introduced admissible evidence that Sutton was still involved in the process, was still overseeing things, was still in communication with her team. And he was part of her team. He knew that. He has firsthand knowledge about that. So there's a dispute of fact about that, but it's a... So the action plan was between November 19, 2012, and December 2012, and it sounds like he complied with it, and his statement, I think, was, and then it went away. Correct. Okay. That's right. All right. And then, but it looks like by early March he's logging late again. Yes. And so after that, he continues to seek transfer because there's obviously something going on here. He has begun to feel that it's personal treatment from Sutton. He's told that by a couple of different other managers who hear from Sutton, that she interfered with the chief. She shut him out of the promotion opportunity, and that that comes from, I believe, from manager, another manager, Mark Romming, and that she, well, what happens in March when he seeks another transfer, she calls him and says something that, again, reinforces his feeling that he's being discriminated against and treated unfairly. She says, you're never going to get a transfer from me, and you have to get it from regional manager, Mayo Tun, and good luck with that. And she's upset that he went around her. She didn't know about that he was applying for the transfer. Well, that's the question. Is that what she's upset about, or is she retaliating against him every time he complains about unfair treatment? He is, you know, subject to more discipline. So he still doesn't get that. He doesn't get that promotion, and he continues to, I mean, transfer. We're now talking about a transfer. Right. And he continues to ask for a transfer all through the spring of 2013. We're into now. Okay. And he keeps saying, again, that my family, I need it for my family. There's a health issue. It would help me to be closer to wherever he works. And she said this to him. She tells him there are no transfers. He sees evidence that that's untrue, and he again goes to complain to her very directly that he feels he's being discriminated against. And now he's given a written warning. May I ask just one question about the failure to promote? We've been talking a lot about failure to transfer. My understanding is that the employer's response to the failure to promote claim, their legitimate non-discriminatory reason allegedly is that during the interview, the person responsible for making the decision thought that your client was not, didn't evidence a knowledge of what the job entailed, essentially. You know the record better than I do. But what is your argument that it was pretextual? Well, Mr. Guyton introduces evidence about all he did to prepare. He talked to a lot of people who'd been in that job before, so it's hard to believe that he went in there not knowing what the job entailed. So that representation of the way the conversation went I think is a jury question and should be left for the jury. So your argument is that that's implausible? It's implausible based on what Mr. Guyton talked about, how he got ready by talking to other people who had been in the position, he knew what the position was, and then we get to the end result. And not only is Mr. Guyton, who's over 40, knocked out of that job, there's another woman over 40 who's also knocked out of the job, and it's given to a very young male Hispanic in his 20s. Thank you for that clarification. So that goes into the analysis also. I'm almost out of time. Do you want to save it for rebuttal? Yes, Your Honor, I would like to do that. Thank you. Good morning, Your Honors. May it please the Court, my name is Max Fisher, and I along with my colleague Amy McKay are counsel for the defendant in this matter. The plaintiff here did not take a single deposition, nor did he do very much discovery at all into this matter. When it came time to opposing Novo Nordisk's motion for summary judgment, the plaintiff cited none of his own deposition testimony at all. Instead, he relied on his one piece of evidence, which was his declaration, a 108-paragraph declaration. The declaration ignored or contradicted numerous admissions that the plaintiff made in his deposition, and it sought to inject entirely new theories as to why he had suffered race  when he was given the opportunity to explain during his deposition. The district court here issued a 45-page decision that exhaustively surveyed the evidence and from Novo Nordisk's perspective rightly concluded that the plaintiff could not establish Novo Nordisk's explanations for the various things about which he was complaining were a pretext. As the court has already indicated, the plaintiffs, there are essentially three things that we understand the plaintiff to be complaining about. The first is a July 2012 promotion that he sought for which he was not selected. Your Honor asked what the evidence of pretext was that was presented to the district court. We would submit, Your Honor, that there was no evidence of pretext submitted whatsoever. Mr. Atkins, who was the decision maker, offered a declaration. Again, his deposition was not taken. Even though the plaintiff obviously knew who he had interviewed with, his name came up during his deposition. Mr. Atkins laid out the reasons, and the reasons were twofold. First, his expectation was that a qualified candidate would have a good understanding of the regional support manager job. This was different than a sales job. This was a job involving sales analytics, looking at business data, and essentially analyzing and developing strategies around that data. And he wanted to see a candidate, as he explained in his declaration, who understood that those were the competencies, and that could offer examples as to how the candidate could fulfill those competencies. As the plaintiff's deposition testimony evidences, consisting with Atkins' declaration, the plaintiff asked rudimentary questions about what the job involved and what his responsibilities would be, which Atkins quickly realized and decided were evidence that this person was unable to sort of explain how his sales competencies translated. He made, importantly, Atkins interviewed the first time around three candidates. There is a, we think, insufficient evidence in the records that suggests that the candidate that the plaintiff identified, Ms. Moss, I think there was an assertion she was over 40. The company records, which Mr. Atkins relied on after the fact to confirm how old she was in connection with his declaration, show that she was under 40. We don't think the plaintiff has offered any competent evidence to show that she was over 40. So we have one additional candidate who was non-African American and under 40 who was not selected. We have a second candidate in this first interview round who was under 40, non-African American, who was also not selected. It is true that the ultimate candidate who was selected was under the age of 40 and not African American, but Mr. Atkins explained this was a candidate who actually understood the job and was able to bring examples of how he would actually perform it, which the plaintiff had not done. Again, that evidence is unchallenged. So we think there's simply no evidence of pretext whatsoever as to the promotion. The two other adverse actions that the plaintiff cites here relate to transfers. As an initial matter, it is our view, Your Honor, that the district court was too generous in finding that the plaintiff had established that either of these transfers constituted an adverse action. You mean the failure to transfer. Sorry, the failure to transfer constituted an adverse action. Novo Nordis introduced in its Statement of Undisputed Facts a statement that the transfers would not involve any increase in rank or compensation or provide any other benefit. The plaintiff's response to that fact was undisputed. He did not dispute that these transfers essentially would not convey any benefit to him. He disputes that, right? He disputes because the West Hollywood was going to be closer to where he had a family situation. So it's not no benefit. That's certainly contested, isn't it? That's right. That actually is right, Your Honor, as I was about to say. It's not as if there wasn't some conceivable personal benefit that the plaintiff thought that he would achieve from the transfer. We fully appreciate that. And to be clear, contrary to what I think was just suggested, there's no evidence that the plaintiff ever said he wanted a transfer to escape his manager and avoid discrimination. That evidence is simply not on the record. To the contrary, this was a matter of personal convenience and due to family issues. But again, in terms of what we think, that's not enough from our perspective to constitute an adverse action. It has to be something that is actually job-related. It has to increase his chances. As a matter of law, is that true? Is there authority on that point that a transfer that would make life easier for personal reasons is not or the denial of that transfer is not an adverse employment action? I believe there is, Your Honor. We cited it in our brief in the district court. I'll go back and check. Yes. And when you look at the cases that the plaintiff cited in his brief, they are all cases involving some positive impact on the job that is being sort of withheld. Is the most comparable employee Wilson? That's a difficult question for us to answer, Your Honor. I guess that is probably accurate to say insofar as the plaintiff has presented it. It's a logging error, right? It's quite frankly unclear, Your Honor, from the record what it is that Ms. Wilson did wrong. The only evidence of it that was introduced, again, came after the close of discovery in plaintiff's declaration. So all we have is what we consider to be his foundationless assertion and labeling as to something that he witnessed. We have no ability to sort of unpack it. Well, that's why it's not foundationless. It's his observation. Again, we take it, right, his assertion is true at this point. And his observation is that he overheard this conversation, that Wilson was asked why she was giving away her free samples to only a handful of customers. I'm paraphrasing, of course. Right. That Wilson admitted she, quote, just logged it in that way, but she actually dispensed the products in smaller amounts to other customers, and she was told not to do that again. Right. Again, I paraphrase. But he alleges, my understanding of the record is that he alleges he overheard that exchange. Correct. That's right. And, sorry, Your Honor, when I meant foundationless, I did not mean to suggest that something to the point of he witnessed himself was foundationless. I meant it in the sense that ascribing to it a logging error or being able to sort of articulate how Novo Nordisk would have viewed it is something that he had no capacity to do. Fair enough. Okay. But you are correct, Your Honor. I think it is kind of the one incident that he refers to with Ms. Wilson is about as close as he gets, for which, of course, she was told verbally reprimanded don't do it, which is consistent, of course, with what happened to Plaintiff. He was verbally reprimanded not to run afoul of the logging regulations actually on multiple occasions, and he still did. Does he allege that there's another employee who was late with logs? He does not. The record, in fact, I asked him that question during his deposition. He couldn't identify anybody. It is undisputed that there's no other person in the record who was late with the logs. He's the only one. Notably, of course, he doesn't allege Ms. Wilson's race. I think it was a suggestion that she was Caucasian. That is not in his declaration, so, again, it doesn't appear to be evidence of race discrimination, even though he does allege she was younger. So it is really, from our perspective, the discipline and the transverse of irisy tied together because, as the undisputed testimony shows, when you're on an action plan or you're not an employee in good standing, you're not eligible for a transfer. That was the articulated reason in company email exchanges. Where in the record do I find that exact statement? That if you're on an action plan, or at least for that period of time, you're not eligible. And then my follow-up question is, when he applied for these transfers, was he on an action plan or the performance improvement plan? So I'll answer that. There are two transfers. Why don't I take them one at a time? The evidence, Your Honor, concerning the policy I believe appears in the declaration of Ms. Canepa, but it also appears in the email exchange that shows the communication among the managers who are considering his request. All right. I probably have it right here. So the answer, as to the first transfer, Your Honor, the answer is yes, he was on an action plan at the time that he made that request. The action plan is dated November 9, 2012. Mr. Guyton's request for the transfer is dated, I believe, December 2, 2012. He was approximately halfway through it. What about the transfer request to Hollywood, West Hollywood? At the time he – well, there's his testimony, Your Honor, on this. The company believes it's equivocal. But what he testified – what he says in his declaration is that he made the request in March. What he testified to in his deposition is that he couldn't remember the date, that maybe it was around March. And obviously, in the intervening time between his deposition, which there was no errata sheet, and when discovery closes, he files his opposition, he wants to ascribe a level of certainty to the date that certainly didn't exist during his deposition. But, again, giving him all reasonable inferences, even ones that might not be justified here, that would have been March when he made the request. The request, however, it is undisputed, again, in the separate statement facts laid out, plaintiff's response, undisputed. It is undisputed that Mr. Carr, who was the manager to whom the plaintiff wanted to transfer, that Mr. Carr took up the request and asked about it to another manager, to the regional manager. To Toone. Toone, correct, Mr. Toone, in May. But wasn't he told at that point that Guyton is either on a performance improvement plan or about to be placed on one? I think he wasn't on one at this point, isn't that right? If we're talking about March, the answer is no, he was not on one. Okay. But, again, the undisputed testimony, the undisputed evidence, is that Carr did not take up that request until May. And when Carr takes up the request and tries to move it forward by inquiring and letting Mr. Toone know that Mr. Guyton had made the request, that happens in May. And as of May, he was on or about to be put on an action plan. Put on one on May 29th, right? Excuse me, Judge Kuczynski. Is that right? Is it May 29th? Yes, Your Honor. The date is May 29th, but the evidence introduced in the record is that the initial drafts of the performance improvement plan were circulated as early as May 8th. Okay. I've interrupted Judge Kuczynski. Could you answer his question? Your Honor, you asked why did Mr. Carr wait so long. Was that your question? That evidence is not in the record, Your Honor. There's no suggestion. The plaintiff doesn't offer a suggestion. Sorry, the plaintiff does offer a suggestion, which I'll turn to in a moment. But there's no other evidence in the record as to why, assuming, again, that it was March. Can we draw the inference that they waited until they could hit him with a performance plan? I don't think, Your Honor, that that logic holds for the following reason. Mr. Carr, again, the plaintiff did not dispute that Mr. Carr does not raise the issue of the transfer until May. The plaintiff ascribed no bias whatsoever to Mr. Carr, not at all. There's no evidence of it introduced. The plaintiff doesn't allege it. Mr. Carr was the manager who he identified as African-American to whom he wanted to transfer twice, and there's no evidence that he introduced that Mr. Carr held some bias. So we don't have an explanation, assuming it was May when he made the request, as to why he waited until May. But, again, turning back to, I think, the question that's implicit in what you're asking, Your Honor, is was it March? Well, when you look at the plaintiff's declaration, for this theory to work, he has to be told that he was somehow denied the transfer in March before he was on an action plan. Not even his own declaration suggests that. Why is that? He has to be told in March? That's what he argues in his brief, Your Honor, that the evidence of pretext here is that he asks for the transfer in March. He's told in March that he's not going to get the transfer. Are we talking about the second transfer? The second transfer, correct. Okay. And when you look, that's what his brief argument, that's what we understood his argument to be. Perhaps we misunderstood. Okay, so a minute ago you said in order for this to work, that has to have happened, but you just mean that's what he's alleged. Correct. Okay. Oh, that's different. All right. I apologize. What is the plaintiff's, first of all, when you look at his, as we did look very closely at his declaration, as I'm sure the Court has, it's he never alleges that he was told in March that he was denied the transfer. That he never says, somebody told me this, I learned this in March. He simply starts one of the sentences of his declaration after the denial of transfer in March, but he doesn't actually offer any evidence to say that it actually happened. But we think more critically, as the Court considers whether the plaintiff has offered competent evidence based on personal knowledge to support an opposition under Rule 56 of the federal rules, civil procedure, his story here hinges on an alleged secret conversation where he labels a secret conversation that Mr. Toone and Mr. Carr have in which Mr. Toone somehow interferes with his chances of this transfer. That's the time when he was told, is there about to be put on the performance improvement plan? Is that what you're referring to? As far as we understand his argument, Your Honor, and I see my time has expired, but yes, that is correct. That's what we understand his argument to be. And again, as a matter of competent evidence, citing to a secret conversation without explaining how you learned it such that it was no longer secret, when you learned it, who you learned it from, we think only underscores the fundamental problem in his showing here, which is that he waited until opposition to summary judgment to share his story. If there are any other questions from the Court, I'd be happy to take them. Otherwise, we would submit, Your Honors. Thank you, Mr. Carr. Thank you very much. Thank you. Just briefly, it appears that an action plan for failure to, if you're on an action plan, you can't get a transfer. It's really more a matter of practice than a matter of policy. Mr. Guyton wasn't on a performance improvement plan in March. He says that this occurred in March. He says that Mr. Carr was excited about it and immediately took the request to Toone, and Toone told Carr that in anticipation that he would be on an action plan, and that sounds like he was eager to interfere with the prospect of Mr. Guyton being able to transfer. Carr is tainted by Toone's response at that point. He may have been a neutral decision maker. He didn't want to take someone who was on a performance improvement plan. But the March-May question is important, and at 2ER125-126 is where he discusses very clearly that this all occurred in March. He's told he doesn't have the transfer because Jill Sutton calls him up, Supervisor Sutton, and tells him, You're not going to get it, and good luck. You don't think you're going to get it from Toone, and if you think you're going to get it from Toone, good luck. Was it wrong to say that he was on a performance improvement plan, yes, or about to be put on one? After all, his calls were he was logging late as of March 6th. He was back to logging late. So was it an incorrect statement? I think it's an incorrect statement, yes. Why? If they were going to do it in May, it doesn't happen until the end of May. Opposing counsel referenced some earlier drafts dated earlier than May 29th. How much earlier? In May. All in May? Okay. I think that was in May 8th or something like that. So there was nothing in March. Now, maybe there was going to be more verbal counseling about that problem. But he was not on an action plan, and he was not about to be, and could have made the transfer then. And it was an adverse employment action to keep him from it. Yes, personal reasons. Yes, the reasons that he could build up a better business there in that territory where he had been before. And we believe that, yes, to extricate himself from Supervisor Sutton in that region. That's why it was an adverse employment action to keep him from transfer. If there are no further questions, I'll submit. Thank you. Thank you very much, counsel. The case is submitted.
judges: Reinhardt, Kozinski, Christen